1 | RAYMOND C. DION (State Bar No. 139206)
BRETT G. HAMPTON (State Bar No. 140535)
2 | **KOLETSKY, MANCINI, FELDMAN & MORROW**
3460 Wilshire Boulevard, Eighth Floor
3 | Los Angeles, CA 90010-2228
Telephone: (213) 427-2350
4 | Facsimile: (213) 427-2366

5 | Attorneys for Plaintiff
ACCEPTANCE INSURANCE COMPANY

6

7 | UNITED STATES DISTRICT COURT

8 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| ACCEPTANCE INSURANCE COMPANY, | CASE NO. CV08-01577 GPS (AGRx) |
| Plaintiff, | **REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON** |
| vs. | |
| AMERICAN SAFETY RISK RETENTION GROUP, INC., and DOES 1 through 100, inclusively, | [Filed and Served Concurrently with Evidentiary Objections to and Motion to Strike Portions of Declaration of Jean P. Fisher] |
| Defendants. | Hearing Date: April 28, 2008<br>Time: 1:30 p.m.<br>Place: Courtroom 7<br>Judge: Hon. George P. Schiavelli |

19 | **TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

20 | COMES NOW Acceptance Insurance Company and replies to the Opposition filed by

21 | Defendant American Safety Insurance Company to Plaintiff's Motion to Remand Case.

22 | American Safety Insurance Company, in its Opposition, misstates the law, misrepresents facts,

23 | and ignores the record, and for these reasons as well as the absence of a legitimate reason for removal

24 | in the first instance, this case should be remanded. Further, Plaintiff seeks an award of costs,

25 | including attorney's fees, upon remand of this case. Mints v. Educational Testing Serv., 99 F.3d 1253,

26 | 1259 (3rd Cir. 1996).

27 | Additionally, Defendant's reliance on the sworn declaration of Jean Fisher essentially proves

28 | Plaintiff's case. Either Ms. Fisher's declaration is completely inadmissible because she lacks personal

*(sidebar)* KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

1 knowledge of any of the alleged facts set forth in her declaration, or her declaration establishes her as

2 an agent of American Safety Insurance Company and also establishes that California is the principal

3 place of business for American Safety Insurance Company.

4 **I.      ASIC'S NOTICE OF REMOVAL WAS UNTIMELY.**

5      **A.     Defendant Misstates the Law Regarding the "First Served Rule."**

6      Defendant adopts as authority a New York District Court case, Piacente v. State University of

7 New York, 362 F.Supp.2d 383 (W.D.N.Y. 2004), that completely misreads the United States Supreme

8 Court's decision in Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc. 526 U.S. 344 (1999). The

9 Murphy Brothers decision addressed the issue of whether service by facsimile was appropriate.

10 Nowhere in that decision is there any discussion of the "last served rule" nor can any part of that

11 decision be construed as undermining or even addressing the "first served rule." Defendant's entire

12 argument in this regard is simply unsupported by any cited authority.

13      The Ninth Circuit has expressly declined to address the question of whether the "last served

14 rule" should replace the existing "first served rule" in United Computer Systems, Inc. v. AT & T Corp.

15 298 F.3d 756, 763, note 4 (9th Cir. 2002). Defendant cites three cases from the Northern District of

16 California but none from the Central District, nor any authority from any court higher than the

17 Northern District of California, in support of its contention that this Court should ignore the rule set

18 forth in the Central District in Transport Indem. Co. v. Financial Trust Co. 339 F.Supp. 405, 409 (C.D.

19 Ca 1972). The United States Supreme Court had an opportunity to reverse the long tradition of strict

20 construction regarding jurisdiction in general and removal in particular in the Murphy Brothers case

21 but did not do so, in accordance with that court's long-held practice of strictly construing removal and

22 similar jurisdictional statutes. *See* Shamrock Oil & Gas Corp. v. Sheets,313 U.S. 100, 108-109 (1941).

23 The Supreme Court has not resolved the question in the past nine years, and it is rank speculation on

24 the part of the Western District of New York or defendant's counsel to state what the Supreme Court

25 would or would not do. The Ninth Circuit has had this issue before it for the past six years yet has

26 failed to reverse the "first served rule."

27      As Defendant has failed to provide any competent authority to support its contention that it had

28 the right to seek removal, this Court must remand the case to the Los Angeles County Superior Court.

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO
REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON

2

**B.     This Case Was Not Initially Removable.**

Defendant argues that the one-year limitations period of 28 U.S.C. §1446(b) does not apply because this case was "initially removable," and claims that Plaintiff conceded that point in its Motion to Remand at page 8, lines 4 through 10. This is patently false. There is no concession that this case was initially removable, either at the lines cited in the Opposition or anywhere else in Plaintiff's Motion. While Plaintiff stated at page 6 of the Motion that American Safety Risk Retention Group could have filed for removal within thirty (30) days of its initial appearance, that is not a concession that the case was "removable," as Plaintiff would have moved for and won remand of the case in response to an improper removal by ASRRG, as well.

The activities of Jean Fisher, acting as the employee and /or agent for ASIS, ASIC and ASRRG in their extensive dealings with insurance claims in the State of California, demonstrate that ASIS. ASIC and ASRRG conduct extensive business in California through the San Diego office occupied by their agent, Ms. Fisher (and other employees of ASIS). This makes ASIS and ASRRG "local" defendants. The fact that Defendant's business activities substantially predominate in California has gone unchallenged by Defendant in its Opposition. Therefore, according to the decision in Tosco Corp. V. Communities for a Better Environment, 236 F.3d 495, 500 (9th Cir. 2001), ASIS is a California corporation handling substantially all of the management and claims functions related to the Construction Defect Claims for ASIC and ASRRG, and these facts create a lack of diversity and further establishes that removal was improper because it violated 28 U.S.C. §1441[b].

**II.     DEFENDANT HAS NOT DEMONSTRATED THAT AMERICAN SAFETY INSURANCE COMPANY IS NOT A CITIZEN OF CALIFORNIA.**

Defendant ASIC tries to smokescreen this Court with a lot of purported "facts" about the presence of ASIC and ASRRG in other states. It should be noted at the outset that a corporation is deemed to be a citizen of all states in which it is incorporated and the place where it has its principal place of business. Bender v. Hilton Riviera Corp., 367 F.Supp. 380, 392 (D.P.R. 1973). Just because a corporation's executive offices are in another state, that is not *per se* evidence that the corporation is to be considered as a citizen of that state. Dimmit & Owens Financial, Inc. v. United States, 787 F.2d 1186, 1190 (7th Cir. 1986). The location of a corporation's home office is not *per se* evidence that a

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

**REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON**

3

1  corporation is foreign, either. <u>Delome v. Union Barge Line Co.</u>, 444 F.2d 225, 233 (5th Cir. 1971),

2  *cert. denied*, 404 U.S. 995 (1971).

3      Defendant relies exclusively on the sworn declaration of Jean Fisher.  Ms. Fisher admits that

4  both ASIC and ASRRG conduct a substantial amount of business in the State of California.  It is clear

5  from the evidence that the claims business activities for ASIC and ASRRG are in fact done in the state

6  of California (San Diego to be more specific).

7      The inclusion of "the principal place of business" requirement into the statutory scheme to

8  determine whether removal will be appropriate was intended to: (1) prevent local businesses (such as

9  these two insurers) from avoiding local trials based solely on their incorporation in other states; and (2)

10 to reserve federal jurisdiction for those parties which are sufficiently "foreign" that they have a

11 legitimate fear of local prejudice. <u>Bel-Bel International Corp. v. Community Bank</u>, 162 F.3d 1101,

12 1106-1107 (11th Cir. 1998).  ASIC has not shown that they face any possibility of "local prejudice" if

13 this case is tried in the Los Angeles County Superior Court.  The case should be remanded.

14      In opposition, Ms. Fisher claims that ASIC and ASRRG are separate and unrelated

15 corporations.  However, in the Annual Report for American Safety Insurance Holding, Ltd., the

16 holding company states that it  conducts business through its "two insurance subsidiaries, American

17 Safety Casualty Insurance Company ("American Safety Casualty") and American Safety Indemnity

18 Company ("American Safety Indemnity"), as well as through American Safety Risk Retention Group,

19 Inc. ("American Safety RRG"), a variable interest entity which is consolidated in our financial

20 statements in accordance with Financial Accounting Standard Board (FASB),    ...." See, Hampton

21 Declaration, Paragraph 3.

22      Moreover, with respect to its claims services and management for ASRRG and ASIC,

23 American Safety Insurance Holding, Ltd Form 10-K provides as follows:

24          **"Our subsidiary American Safety Insurance Services, Inc.** ("ASI

25          Services") provides a range of insurance management and administration

26          services and our subsidiary Exceptional Claims Services, Ins. ("ECSI")

27          **provides claims services for** American Safety Casualty, **American**

28          **Safety Indemnity and American Safety RRG."**

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

---

REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO
REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON

4

1  Exhibit "A," Form 10-K, Page 2 ["Who we are"].

2       The Form 10-K also states as follows:

3           ".... We [American Safety Insurance Holding, Ltd.] assisted in the

4           formation of American Safety RRG [ASRRG] in 1988 in order to

5           establish a U.S. insurance company to market and underwrite specialty

6           environmental coverages. ...."

7

8           "American Safety RRG is a variable interest entity which is consolidated

9           in our financial statements in accordance with FASB, FIN 46. ...."

10  Exhibit "A," Form 10-K, Page 22-23 ["Our non-subsidiary affiliate"]

11       In addition, in the Notes to Consolidated Financial Statements, subsection (c), the Form 10-K

12  states as follows:

13           "... In accordance with FASB Interpretation No. 46 (FIN 46),

14           *Consolidation of Variable Interest Entities* (VIEs) and FASB

15           Interpretation No. 46 Revised (FIN 46R), the accompanying financial

16           statements consolidate American Safety RRG, based on its status as a

17           VIE and the Company's status as the primary beneficiary of the VIE. ...."

18  Exhibit "A," Form 10-K, Page 82-83 [Notes ....]

19       Finally, with respect to the claims handling role of ASIS in the subsidiaries and related

20  companies of American Safety Insurance Holding, Ltd., Form 10-K further provides as follows:

21           "ASI Services, directly and through its subsidiaries, provides business

22           development, underwriting, accounting, program management,

23           brokerage, claims adminstration, marketing and administration services

24           to our U.S. insurance operations and our non-subsidiary risk retention

25           group affiliate.

26

27           ASI Services has developed many of our primary insurance and

28           reinsurance programs. **Since 1990, ASI Services has served as the**

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

---

**REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON**

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

1 **program manager for American Safety RRG, providing it with**

2 **program management, underwriting, loss control, marketing and**

3 **accounting services pursuit to guidelines and procedures established**

4 **by the Board of Directors of American Safety RRG.**

6 ASI Services provides a number of services to our two U.S. insurance

7 subsidiaries and to American Safety RRG.  These services include:

8 \*        business development services for developing new producer

9          relationships and new business opportunities;

10 \*       program management services for the overall management and

11         administration of a program;

12                              * * *

13 \*       claims administration services for the prompt reporting and handling of

14         claims, the supervision of claims adjusters and TPA's;

15                              * * *

16 \*       administrative services, including policy and endorsement issuance, data

17         processing, billing, collecting and reporting premiums, producing

18         financial reports and paying claims."

19 Exhibit "A," Form 10-K, Page 23 ["Insurance Services"]

20         All of this activity is somewhat underplayed but nonetheless confirmed by Ms. Fisher, who

21 states that she is responsible for (duties and responsibilities) oversight of all construction defect-related

22 litigation naming ASIC and ASRRG.

24 **III.    PLAINTIFF HEREBY REQUESTS AN AWARD OF COSTS AND FEES UPON**

25 **        REMAND OF THIS CASE.**

26         28 U.S.C. §1447[c] authorizes this Court to order the Defendant to pay to Plaintiff its "just

27 costs and any actual expenses, including attorney fees, incurred as a result of the removal..." *See*

28 Martin v. Franklin Capital Corp. 546 U.S. 132 (2005).  The test for an award of costs and fees should

1   turn on the reasonableness of the removal and whether it was conducted predominantly to delay the

2   proceedings between the parties and increase the costs to the plaintiff. Martin, *supra*, 546 U.S. at 137.

3        In the instant matter, Defendant ASRRG was faced in the state court with a meritorious motion

4   for summary judgment when its related corporation, ASIC, filed for removal. The removal was clearly

5   intended to avoid the motion for summary judgment in state court and to drive up the costs for this

6   Plaintiff. Accordingly, Plaintiff asks that this Court issue an award for costs, including attorney fees.

7

8   Dated: April 21, 2008             KOLETSKY, MANCINI, FELDMAN & MORROW

9

10                        By: _____

11                            Raymond C. Dion, Esq.
                             Brett G. Hampton, Esq.

12                             Attorneys for Plaintiff ACCEPTANCE INSURANCE
                            COMPANY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

**REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON**

7

## DECLARATION OF BRETT G. HAMPTON

I, Brett G. Hampton, declare as follows:

1.     I am an attorney at law, duly licensed to practice in the State of California and  before the United States District Court, Central District of California, and I am an associate attorney with KOLETSKY, MANCINI, FELDMAN & MORROW, attorneys of record herein for Plaintiff Acceptance Insurance Company in the instant action.  I have personal knowledge of the facts set forth herein and could and would competently testify as to the truth of same if required to do so.

2.     In connection with my review of the supporting declarations of the Defendants, particularly Ms. Jean Fisher, I noted that Ms. Fisher stated that "ASIC [Indemnity Company] and ASRRG [Risk Retention Group] are separate, unrelated corporations."   Ms. Fisher understates or misstates the obvious relationship between ASIC and ASRRG.

3.     We obtained a copy of the Form 10-K for American Safety Insurance Holdings, Ltd. Attached hereto as Exhibit "A" is a true and correct copy of relevant portions of the Form 10-K. According to the Form 10-K, in the United States, American Safety Insurance Holding, Ltd. conducts business as follows:

> "insurer[s] and place[s] risks through our [its] two insurance subsidiaries, American
> Safety Casualty Insurance Company ("American Safety Casualty") and American
> Safety Indemnity Company ("American Safety Indemnity"), as well as through
> American Safety Risk Retention Group, Inc. ("American Safety RRG"), a variable
> interest entity which is consolidated in our financial statements in accordance with
> Financial Accounting Standard Board (FASB),    ...."

Exhibit "A," Form 10-K, Page 2 ["Who we are"].

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

---

REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO
REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON

1   Moreover, with respect to its claims services and managment for ASRRG and ASIC, American

2   Safety Insurance Holding, Ltd Form 10-K provides as follows:

3   **"Our subsidiary American Safety Insurance Services, Inc.** ("ASI Services")

4   provides a range of insurance management and administration services and our

5   subsidiary Exceptional Claims Services, Ins. ("ECSI") **provides claims services for**

6   American Safety Casualty, **American Safety Indemnity and American Safety RRG."**

7   Exhibit "A," Form 10-K, Page 2 ["Who we are"].

8

9   4.      The Form 10-K also states as follows:

10  ".... We [American Safety Insurance Holding, Ltd.] assisted in the formation of

11  American Safety RRG [ASRRG] in 1988 in order to establish a U.S. insurance

12  company to market and underwrite specialty environmental coverages. ...."

13

14  "American Safety RRG is a variable interest entity which is consolidated in our

15  financial statements in accordance with FASB, FIN 46. ...."

16  Exhibit "A," Form 10-K, Page 22-23 ["Our non-subsidiary affiliate"]

17

18  5.      In the Notes to Consolidated Financial Statements, subsection (c), the Form 10-K states

19  as follows:

20  "... In accordance with FASB Interpretation No. 46 (FIN 46), *Consolidation of Variable*

21  *Interest Entities* (VIEs) and FASB Interpretation No. 46 Revised (FIN 46R), the

22  accompanying financial statements consolidate American Safety RRG, based on its

23  status as a VIE and the Company's status as the primary beneficiary of the VIE. ...."

24  Exhibit "A," Form 10-K, Page 82-83 [Notes ....]

25

26

27

28

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

**REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO
REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON**

9

1      6.      With respect to the claims handling role of ASIS in the subsidiaries and related

2  companies of American Safety Insurance Holding, Ltd., Form 10-K further provides as follows:

3          "ASI Services, directly and through its subsidiaries, provides business development,

4          underwriting, accounting, program management, brokerage, claims adminstration,

5          marketing and administration services to our U.S. insurance operations and our non-

6          subsidiary risk retention group affiliate.

7

8          ASI Services has developed many of our primary insurance and reinsurance programs.

9          **Since 1990, ASI Services has served as the program manager for American Safety**

10         **RRG, providing it with program management, underwriting, loss control,**

11         **marketing and accounting services pursuit to guidelines and procedures**

12         **established by the Board of Directors of American Safety RRG.**

13

14         ASI Services provides a number of services to our two U.S. insurance subsidiaries and

15         to American Safety RRG.  These services include:

16              *       business development services for developing new producer

17                      relationships and new business opportunities;

18              *       program management services for the overall management and

19                      administration of a program;

20                                      * * *

21              *       claims administration servcies for the prompt reporting and handling of

22                      claims, the supervision of claims adjusters and TPA's;

23                                      * * *

24              *       administrative services, including policy and endorsement issuance, data

25                      processing, billing, collecting and reporting premiums, producting

26                      financial reports and paying claims.

27  Exhibit "A," Form 10-K, Page 23 ["Insurance Services"]

28

KOLETSKY, MANCINI, FELDMAN & MORROW
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

---

**REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON**

10

1       7.    During the course of our investigation into the relationship between ASIC, ASIS, and

2   ASRRG, we obtained, and provide herewith, copies of the web page for American Safety Insurance.

3   Attached hereto as Exhibit "B" are true and correct copies of the web page sections for American

4   Safety Insurance.

5       8.    Attached hereto is a detailed flow-chart of the Corporate Structure for American Safety

6   Insurance Company Holding, Inc. as reflected on www.americansafetyinsurance.com [Copyright 2007

7   American Safety Insurance Services, Inc.].  See, Exhibit "B".  The Corporate Structure clearly reflects

8   the inter-relationship of the Defendants (as detailed also in the 10-K Annual Statement (above)).

9       9.    Also reflected on www.americansafetyinsurance.com [Copyright 2007 American

10  Safety Insurance Services, Inc.], is the fact that American Safety Insurance Services, Inc. (the claims

11  management arm for ASSRG and ASIC) has as its "Construction Defect Claims" office in San Diego,

12  California.  See, Exhibit "B".  The underlying claim involves a construction defect claim filed in

13  California.

14      10.    Also reflected on www.americansafetyinsurance.com [Copyright 2007 American

15  Safety Insurance Services, Inc.], is the fact that reporting of Construction Defect Claims is to be made

16  to the San Diego office.

17      11.    Also reflected on www.americansafetyinsurance.com [Copyright 2007 American

18  Safety Insurance Services, Inc.], is the fact that in 1990  "American Safety Insurance Services, Inc.

19  (then called EMIS) was formed as a program administrator for American Safety RRG, and hired the

20  company's first full-time employee."

21      12.    As acknowledged by Ms. Fisher (who office is in San Diego California) in her

22  declaration, Ms. Fisher is responsible for the oversight of "all construction defect-related litigation

23  naming ASIC and ASRRG."

24      13.    I have spent 23 hours on the research concerning and preparation of this motion and

25  reply.  I anticipate the expenditure of an additional 3 hours for the argument of this motion.  My office

26  is charging the client the reasonable rate of $135 per hour.

27

28

**KOLETSKY, MANCINI, FELDMAN & MORROW**
Lawyers
3460 Wilshire Blvd., Eighth Floor
Los Angeles, CA 90010
(213) 427-2350

---

**REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO
REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON**

11

14.    As of the date of the hearing, my client will have incurred $3,510.00 in costs associated with the removal of this case to the Federal Court, costs which my client would not have incurred in the State Court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: April 21, 2008

_____
Brett G. Hampton, Declarant

REPLY OF PLAINTIFF ACCEPTANCE INSURANCE COMPANY TO OPPOSITION TO MOTION TO REMAND CASE; SUPPORTING DECLARATION OF BRETT G. HAMPTON

12

TOTAL P.05

EXHIBIT "A"

10-K 1 form10k123107.htm

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
--------------------

**FORM 10-K**

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2007          Commission file number 1-14795

**AMERICAN SAFETY INSURANCE HOLDINGS, LTD.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Bermuda | Not applicable |
| (State of incorporation | (I.R.S. Employer |
| or organization) | Identification No.) |

| | |
|---|---|
| 31 Queen Street | |
| 2nd Floor | |
| Hamilton, Bermuda | HM 11 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number: (441) 296-8560

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange, Inc. |

Securities to be registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well known seasoned issuer as defined in Rule 405 of the Securities Act.  Yes ___ No _X_

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.
Yes___ No X

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes_X_ No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. __

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer.

| | |
|---|---|
| Large Accelerated Filer [  ] | Accelerated Filer [ x ] |
| Non-accelerated Filer [  ] | Smaller reporting company [  ] |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ___ No  X

The aggregate market value of registrant's voting common stock held by non-affiliates based upon the closing sales price as reported by the New York Stock Exchange as of June 29, 2007 was $180,038,343.

The number of shares of registrant's common stock outstanding on March 11, 2008 was 10,729,976.

Documents Incorporated by Reference: Part III of this Form 10-K incorporates by reference certain information from Registrant's Proxy Statement for the 2008 Annual General Meeting of the Shareholders (the "2008 Proxy Statement").

AMERICAN SAFETY INSURANCE HOLDINGS, LTD.

Table of Contents

PART I

|         |                                                                                          |    |
|---------|------------------------------------------------------------------------------------------|----|
|         |                                                                                          | 1  |
| Item 1. | Business                                                                                 | 27 |
| Item 1A. | Risk Factors                                                                            | 37 |
| Item 1B. | Unresolved Staff Comments                                                               | 37 |
| Item 2. | Properties                                                                                | 38 |
| Item 3. | Legal Proceedings                                                                         | 38 |
| Item 4. | Submission of Matters to a Vote of Security Holders                                       |    |

PART II

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchase of Equity Securities | 40 |
| Item 6. | Selected Financial Data                                                                   | 41 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations     | 44 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk                               | 64 |
| Item 8. | Financial Statements and Supplementary Data                                               | 65 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures     | 65 |
| Item 9A. | Control and Procedures                                                                   | 65 |
| Item 9B. | Other Information                                                                        | 66 |

PART III

| Item 10. | Directors , Executive Officers and Corporate Governance of Registrant                    | 67 |
| Item 11. | Executive Compensation                                                                   | 67 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 67 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence                | 67 |
| Item 14. | Principal Accountant Fees and Services                                                   | 67 |

PART IV

| Item 15. | Exhibits and Financial Statements and Schedules                                          | 68 |

# PART I

## Item 1. Business

In this Report, the terms "we," "our," "us," "Company" and "American Safety Insurance" refer to American Safety Insurance Holdings, Ltd. and, unless the context requires otherwise, includes our subsidiaries.

We maintain a web site at *www.amsafety.com* that contains additional information regarding the Company. Under the caption Investor Relations - "SEC Filings" on our website, we provide access, free of charge, to our filings with the Securities and Exchange Commission ("SEC"), including Forms 3, 4 and 5 filed by our officers and directors as soon as reasonably practical after electronically filing such material with the SEC.

### Cautionary Statement Regarding Forward-looking Statements

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the U.S. federal securities laws. We intend these forward-looking statements to be covered by the safe harbor provisions for forward-looking statements in the United States securities laws. In some cases, these statements can be identified by the use of forward-looking words such as "may", "should", "could", "anticipate", "estimate", "expect", "plan", "believe", "predict", "potential", and "intend". Forward-looking statements contained in this report include information regarding our expectations with respect to pricing and other market conditions, our growth prospects, the amount of our acquisition costs, the amount of our net losses and loss reserves, the projected amount of our capital expenditures, managing interest rate risks, valuations of potential interest rate shifts and measurements of potential losses in fair market values of our investment portfolio. Forward-looking statements only reflect our expectations and are not guarantees of performance. These statements involve risks, uncertainties and assumptions. Actual events or results may differ materially from our expectations. Important factors that could cause actual events or results to be materially different from our expectations include (1) actual claims exceeding our loss reserves, (2) the failure of any of the loss limitation methods we employ, (3) the effects of emerging claims and coverage issues, (4) inability to collect reinsurance recoverables, (5) the loss of one or more key executives, (6) a decline in our ratings with rating agencies, (7) loss of business provided to us by our major brokers, (8) changes in governmental regulations, (9) increased competition, (10) general economic conditions, (11) changes in the political environment of certain countries in which we operate or underwrite business, and (12) the other matters set fort under Item 1A, "Risk Factors" included in this report. We undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

### Who We Are

We are a Bermuda-based specialty insurance and reinsurance company that provides customized products and solutions to small and medium-sized businesses in industries that we believe are underserved by the standard market. For over twenty years, we have developed specialized coverages and alternative risk transfer products not generally available to our customers in the standard market because of the unique characteristics of the risks involved and the associated needs of the insureds. We specialize in underwriting these products for insureds with environmental risks and construction risks, as well as in developing programs for other specialty classes of risk and providing third party reinsurance.

We were formed in 1986 as an insurance company in Bermuda and began our operations providing insurance solutions to environmental remediation businesses in the U.S. at a time when insurance coverage for these risks was virtually unavailable. Since then, we have continued to identify opportunities in other industry sectors underserved by the standard carriers where we believe we can achieve strong and consistent returns on equity. We capitalize on these opportunities by (i) leveraging our strong relationships with agents and brokers, which we refer to as producers, among whom we believe have a recognized commitment to the specialty market, (ii) charging a higher premium for the risks we

1

underwrite and the services we offer due to the limited availability of coverages for these risks and (iii) mitigating our loss exposure through customized policy terms, specialized underwriting and proactive loss control and claims management.

In Bermuda, we assume third party and intercompany reinsurance premiums through our reinsurance subsidiary, American Safety Reinsurance, Ltd. ("American Safety Re"). American Safety Assurance, Ltd. ("American Safety Assurance") is our Bermuda based segregated account captive, which serves as a risk sharing vehicle for program managers and insureds by allowing them to assume a portion of their underwriting risks. During 2007, we acquired Ordinance Holdings, Limited, adding to our Bermuda subsidiaries and further diversifying our operations to provide actuarial and brokerage services. Our Bermuda subsidiaries also facilitate the allocation of risk among our insurance subsidiaries and provide us with greater flexibility in managing our capital. In the U.S. we insure and place risks through our two insurance subsidiaries, American Safety Casualty Insurance Company ("American Safety Casualty") and American Safety Indemnity Company ("American Safety Indemnity"), as well as through American Safety Risk Retention Group, Inc. ("American Safety RRG"), a variable interest entity which is consolidated in our financial statements in accordance with Financial Accounting Standard Board (FASB), Interpretation 46 (FIN46). Our subsidiary American Safety Insurance Services, Inc. ("ASI Services") provides a range of insurance management and administrative services and our subsidiary Exceptional Claims Services, Inc. ("ECSI") provides claims services for American Safety Casualty, American Safety Indemnity and American Safety RRG.

**Our Market**

We actively participate in the excess and surplus lines ("E&S"), the alternative risk transfer ("ART") and assumed reinsurance markets.

*Excess and Surplus Lines*

Excess and surplus lines insurers provide coverage for difficult-to-place risks that do not fit the underwriting criteria of insurance companies operating in the standard insurance market. In the standard insurance market, policies must be written by insurance companies that are licensed to transact business as admitted carriers by the state insurance regulators in the state in which the policy is issued. Standard insurance market policy rates and forms are highly regulated and coverages are largely uniform. In contrast, excess and surplus lines insurers are less restricted by these rate and form filing regulations, thereby providing them with more flexibility over the premiums they can charge and the policy terms and conditions they can offer.

Included in our description of the excess and surplus lines market is the specialty admitted market. Insurance carriers operating in the specialty admitted market underwrite complex risks similar to excess and surplus lines carriers, but are licensed by the insurance regulators in the states in which they operate as admitted insurance companies. Although they are admitted in the jurisdictions in which they operate, specialty admitted carriers are typically less restricted by policy rate and form regulations than standard admitted carriers due to the complexity of the risks being underwritten, the absence of standard market coverage, or the nature of the coverages provided. Some insureds with complex insurance needs require coverage from an admitted insurance company due to regulatory, legal, marketing or other factors. We currently underwrite specialty admitted policies in our environmental business line in California, Illinois, New Jersey, Texas and New York. We also write a small portion of our program business on a specialty admitted basis. All of our surety bonds are written on an admitted basis in accordance with standard industry practice.

The property and casualty insurance industry has historically been a cyclical industry consisting of both "hard market" periods and "soft market" periods. The excess and surplus lines market historically has tended to move in response to the underwriting cycles in the standard insurance market. Hard market periods are characterized by shortages of underwriting capacity, limited availability of capital, less

2

competition and higher premium rates. Typically, during hard markets, as rates increase and coverage terms become more restrictive, business shifts from the standard insurance market to the excess and surplus lines market as standard insurance market carriers rely on traditional underwriting techniques and focus on their core business lines. In soft markets, business shifts from the excess and surplus lines market to the standard insurance market as standard insurance market carriers tend to loosen underwriting standards and seek to expand market share by moving into business lines traditionally characterized as "surplus lines."

Beginning in 2004, we believe the property and casualty insurance market has softened significantly and the number of insurers competing for premium in the excess and surplus lines market has increased. These competitors include several start-up companies as well as larger standard insurers looking to capture market share by moving from the admitted market to the excess and surplus lines market. This increased competition has caused rates to decline in targeted markets, in some cases, significantly. Despite this softening trend, we believe there are profitable growth opportunities from which we can benefit, resulting from our diversification into new geographic locations and lines of business.

*Alternative Risk Transfer*

The alternative risk transfer market, or ART market, provides insurance, reinsurance and risk management products for insureds who want more control over the claims administration process and who pay very high insurance premiums or are unable to find adequate insurance coverage. The ART market originated during the 1980's when obtaining various types of commercial liability insurance coverages was difficult for businesses in certain industries due to the nature of their operations or the industries in which they operated. To meet the risk management or insurance needs of these businesses new alternative risk transfer solutions were developed, such as captive insurance companies and risk retention groups. Captive insurance companies are risk sharing vehicles, the assets of which are contributed by one interest or a group of related interests so as to provide insurance coverage for their business operations. Risk retention groups are companies that are owned by their insureds that, while being licensed only in the state of their formation, are able to write insurance in all states through the Federal Liability Risk Retention Act. These alternative risk transfer arrangements blend risk transfer and risk retention mechanisms and, along with self-insurance, form the ART market.

The ART market has grown substantially over the past seven years through the creation of additional captives and risk retention groups. According to A.M. Best, net premiums written in the ART market grew approximately 47% between 2000 and 2006, for a cumulative annual growth rate (CAGR) of 8%. During this time, the ART market expanded to include a wider range of risk sharing vehicles, and benefited from more favorable regulation in certain jurisdictions in the U.S. The ART market has responded effectively to the strategic needs of insureds for better financial management, improved claims handling, more effective risk management, customized insurance programs and access to reinsurance markets.

The ART market has traditionally been inversely correlated to the standard market's underwriting cycle, expanding in hard market periods and retracting in soft market periods. We believe, however, that this correlation has become less meaningful in recent years as ART solutions have become more accessible and better managed, evidenced by a sharp increase in the number of captive formations and more domestic and offshore domiciles, such as Vermont and Bermuda, offering regulatory environments conducive to captive formations and operations. While this continued growth has contributed to the competitive environment in the ART market, customers in certain industries continue to experience difficulty obtaining adequate and affordable coverages that meet their needs.

3

*Assumed Reinsurance*

Reinsurance is an arrangement in which the reinsurer agrees to indemnify an insurance or reinsurance company, the ceding company, against all or a portion of the insurance risks underwritten by the ceding company under one or more insurance or reinsurance contracts. Reinsurance can provide a ceding company with several benefits, including a reduction in net liability on individual risks or classes of risks, and catastrophe protection from large or multiple losses. Reinsurance also provides a ceding company with additional underwriting capacity by permitting it to accept larger risks. Reinsurance, however, does not discharge the ceding company from its liability to policyholders. Rather, reinsurance serves to indemnify a ceding company for losses payable by the ceding company to its policyholders.

During soft insurance markets, ceding companies tend to retain more of their risk, resulting in less premium ceded to assumed reinsurers. As this trend continues, the reinsurers reduce rates to attract producers. Although there has been increased competition and pricing pressure, we have been able to identify opportunities in attractively priced areas.

## Our Products

Our core product segments are excess and surplus lines, alternative risk transfer and assumed reinsurance:

*Excess and Surplus Lines.* We provide the following excess and surplus lines products:

- *Environmental.* We underwrite various types of environmental risks including ProStar, middle market and environmental impairment liability. We do not provide coverage for manufacturers or installers of products containing asbestos, but instead insure the contractors that remediate asbestos. For the year ended December 31, 2007, we had gross premiums written of $47.9 million and net premiums written of $31.4 million in our environmental business line, representing 21.9% and 20.9% of our total gross and net premiums written, respectively.

The environmental risks we underwrite are as follows:

  - *ProStar.* This segment focuses on smaller environmental contractor and consultant risks with revenues generally below $3 million. ProStar totaled $19.5 million, or 40.7% of our total environmental gross premiums written for the year ended December 31, 2007.

  - *Middle Market.* This segment focuses on environmental contractor and consultant risks with revenues above $3 million. Middle Market totaled $24.9 million, or 52.0% of our total environmental gross premiums written for the year ended December 31, 2007.

  - *Environmental Impairment Liability.* This segment targets fixed site pollution liability business such as manufacturers, real estate and waste facilities. Gross written premiums for environmental impairment liability for the year ended December 31, 2007 totaled $3.5 million, or 7.3% of total environmental gross premiums written.

- *Construction.* We underwrite various types of residential and commercial construction risks. Our construction insurance coverages consist mostly of primary general and excess general liability coverages. For the year ended December 31, 2007, we had gross premiums written of $59.5 million and net premiums written of $50.5 million in our construction business line, representing 27.3% and 33.7% of our total gross premiums written and net premiums written, respectively.

The construction risks we underwrite include:

4

- *Residential Construction.* We provide coverage for contractors involved with the construction and remodeling of residential properties. The types of residential contractors we insure primarily include graders, framers, concrete workers, drywall installers and general contractors. For the year ended December 31, 2007, residential construction represented 71.2% of our total construction gross premiums written.

- *Commercial Construction.* The commercial contractors we insure primarily include framers (predominantly for apartments), concrete workers and graders. Many of the commercial contractors we insure derive a portion of their revenues from residential construction work. For the year ended December 31, 2007, commercial construction represented 26.9% of our total construction gross premiums written.

- *Other construction.* Also included in our construction business line are other excess and surplus lines coverages for underserved markets, including general liability for building owners and equipment dealers. The gross premiums written associated with these excess and surplus lines policies represented 1.9% of our total construction gross premiums written for the year ended December 31, 2007.

- *Products Liability.* In 2006, the Company began to write selected general and products liability business, offering both primary and excess products to small and middle market accounts. For the year ended December 31, 2007, products liability represented 2.6% and 2.5% of our total gross premiums written and net premiums written, respectively.

- *Excess.* The Company's excess product is focused primarily in the construction and products liability area. In 2006, the Company added a new underwriting office in Middletown, New Jersey, which has allowed the Company to expand its excess liability product to write over other carriers' primary polices and offer umbrella liability coverage. The Company also increased the available policy limits up to $10 million. For the year ended December 31, 2007, excess represented 2.9% and 0.5% of our total gross premiums written and net premiums written, respectively.

- *Property.* In 2007, the Company began to write property with a focus on fire exposed premises liability risks primarily within the eastern U.S. that does not contain a high exposure to catastrophes. For the year ended December 31, 2007, property represented 1.4% of our total gross premiums written and net premiums written, respectively.

- *Surety.* Surety is a contract under which an insurer guarantees certain obligations of a second party to a third party. We are listed as an acceptable surety on federal bonds, commonly known as a "Treasury-listed" or "T-listed" surety, primarily providing contract performance and payment bonds to environmental contractors and general construction contractors in 47 states and the District of Columbia. For the year ended December 31, 2007, we had gross premiums written of $6.4 million and net premiums written of $6.1 million in our surety business line, representing 2.9% and 4.0% of our gross premiums written and net premiums written, respectively.

*Alternative Risk Transfer.* We provide the following alternative risk transfer products:

- *Specialty Programs.* Working with third party program managers, reinsurance intermediaries and reinsurers, we target small and medium-sized businesses with homogenous groups of specialty risks where the principal insurance requirements are general, professional or pollution liability. In 2007, we expanded our capabilities by adding property as an available coverage. We outsource the underwriting and program administration duties for these programs to program managers with established underwriting expertise in the specialty program area. Our specialty programs consist primarily of casualty insurance coverages for construction contractors, pest control operators, small auto dealers, real estate brokers, restaurant and tavern owners, bail bondsmen and parent/teacher associations.

5

We differentiate ourselves from our program competitors primarily in two ways. First, we typically require the underwriters of the business and the program managers to share in the risk and profits of the business they produce by assuming a portion of the premiums and the losses on the coverage being offered on a quota share basis. Our Bermuda segregated account captive, American Safety Assurance, can be utilized to facilitate the risk sharing position of the program manager by providing a vehicle for the program manager to collateralize its portion of the risk. The requirement to share a portion of the risk encourages the program manager to focus on underwriting profitability rather than solely on the production of commission income through premium volume. Second, we choose to focus on smaller programs where there are fewer competitors, thereby allowing us to obtain terms and conditions more favorable to us.

In 2007 we had gross premiums written of $68.1 million and net premiums written of $34.3 million in our specialty programs business line, representing 31.2% and 22.8% of our total gross and net premiums written, respectively. We also earn fee income on the specialty program business that we write.

- *Fully funded.* Fully funded policies allow us to meet the needs of insureds that, due to the nature of their businesses, pay very high insurance premiums or are unable to find adequate insurance coverage. Typically, our insureds are required to maintain insurance coverage to operate their business and the fully funded product allows these insureds to provide evidence of insurance, yet at the same time maintain more control over insurance costs and handling of claims. Our fully funded product accomplishes this by giving our insureds the ability to fund their liability exposures via a self-insurance vehicle, such as our segregated account captive, American Safety Assurance, or through another captive vehicle established by the insured. We do not assume underwriting risk on these policies, but instead earn a fee for providing the policies. Policy limits are set based on the requirements of the insured, and the insured funds the entire aggregate limit through a combination of cash and irrevocable letters of credit. These cash amounts are accounted for as a liability. The aggregate policy limit caps the total damages payable under the policy, including all defense costs. We write fully funded general and professional liability policies for businesses operating primarily in the healthcare and construction industries. During 2007, we generated $2.1 million in fees from fully funded business.

- *Partially funded.* Our partially funded product is used by entities that want to self insure a portion of their risk. This product combines a level of underwriting risk with a self insured component and compliments our fully funded product.

*Assumed Reinsurance.*

In 2007 the Company began to write assumed reinsurance through our subsidiary, American Safety Re, focusing on casualty reinsurance for risk retention groups, captives and small specialty insurance companies. Treaties entered into during 2007 included auto liability, professional liability for accountants and lawyers, international and domestic D&O, general liability for small grocery stores and a small participation in an international property catastrophe treaty. Assumed reinsurance premium written in 2007 totaled $21.2 million or 9.7% of total gross written premium and 14.2% of net written premium.

*Runoff Lines.*

When certain business lines do not meet our profit or production expectations, we take corrective actions, which may include exiting those business lines. When we exit a business line, we no longer renew or write any new policies in that business line, although we do continue to service existing policies

6

| S&P's/Moody's Rating | Fair Value at December 31, 2006 | Amortized Cost at December 31, 2006 | Percent of Fair Value Total |
|---|---|---|---|
| | | (In thousands) | |
| AAA/Aaa (including U.S. Treasuries of $35,720) | $354,388 | $357,105 | 72.3% |
| AA/Aa | 33,279 | 33,205 | 6.8 |
| A/A | 94,244 | 94,613 | 19.2 |
| BBB/Baa | 7,344 | 6,831 | 1.5 |
| Less than BBB/Baa | 777 | 771 | 0.2 |
| Total | $490,032 | $492,525 | 100% |

(1)     The less than BBB/Baa rated securities were rated investment grade at the time of investment.

The National Association of Insurance Commissioners (the "NAIC") has a security rating system by which it assigns investments to classes called "NAIC designations" that are used by insurers when preparing their annual financial statements. The NAIC assigns designations to publicly traded as well as privately placed securities. The designations assigned by the NAIC range from class 1 to class 6, with a rating in class 1 being the highest quality. As of December 31, 2007, the majority of our portfolio was invested in securities rated in class 1 or class 2 by the NAIC, which are considered investment grade.

The weighted average maturity of our bond portfolio at December 31, 2007, was 6.72 years. The maturity distribution of our fixed income portfolio, as of December 31, 2007, based on stated maturity dates with no prepayment assumptions, was as follows:

| Maturity | Fair Value | Amortized Cost |
|---|---|---|
| | (In thousands) | |
| Due in one year or less | $ 24,458 | $24,409 |
| Due from one to five years | 91,190 | 89,789 |
| Due from five to ten years | 146,279 | 145,802 |
| Due after ten years | 45,150 | 44,242 |
| Mortgage-backed securities | 222,493 | 221,402 |
| Total | $529,570 | $525,644 |

Our mortgage-backed securities are subject to risks associated with the variable prepayments of the underlying mortgage loans. All of our mortgage-backed securities are issued by FNMA or FreddieMac. As a result, we do not believe that these investments present a significant exposure to sub-prime mortgage risks.

**Our Non-Subsidiary Affiliate**

The Risk Retention Act of 1986 (the "Risk Retention Act") allowed companies with specialized liability insurance needs not available in the standard insurance market to create a new type of insurance vehicle called a risk retention group. We assisted in the formation of American Safety RRG in 1988 in order to establish a U.S. insurance company to market and underwrite specialty environmental coverages. The advantage of writing policies through a risk retention group is that it is permitted to write policies in all fifty states without having to qualify to do so in each state.

22

American Safety RRG is a variable interest entity which is consolidated in our financial statements in accordance with FASB, FIN 46. American Safety RRG is authorized to write liability insurance in all 50 states as a result of the Risk Retention Act and is licensed by the Vermont Department of Banking, Insurance, Securities and HealthCare Administration (the "Vermont Department") under Title 8 of the Vermont Statute Annotated ("the Vermont Captive Act") as a stock captive insurance company. Presently, four of our directors are also directors of American Safety RRG: David V. Brueggen, Thomas W. Mueller, Cody W. Birdwell and Stephen R. Crim. The directors of American Safety RRG are elected annually by the shareholders/insureds of American Safety RRG.

We transferred our book of environmental insurance business previously written in Bermuda to American Safety RRG in 1988 to allow us to write that insurance on a domestic basis. Prior to October 2006, our insurance subsidiaries participated in the ongoing business of American Safety RRG through a pooling agreement (whereby we retained 75% of the premiums and risk). Effective October 1, 2006, the Company commuted this pooling agreement for accident years 2002 to 2006 with its affiliates. This commutation did not result in any gain or loss to the respective parties involved. Also effective October 1, 2006, American Safety RRG entered into a 90/10 quota share agreement with American Safety Re, on the environmental business.

**Insurance Services**

ASI Services, directly and through its subsidiaries, provides business development, underwriting, accounting, program management, brokerage, claims administration, marketing and administrative services to our U.S. insurance operations and our non-subsidiary risk retention group affiliate.

ASI Services has developed many of our primary insurance and reinsurance programs. Since 1990, ASI Services has served as the program manager for American Safety RRG, providing it with program management, underwriting, loss control, marketing and accounting services pursuant to guidelines and procedures established by the Board of Directors of American Safety RRG.

ASI Services provides a number of services to our two U.S. insurance subsidiaries and to American Safety RRG. These services include:

- business development services for developing new producer relationships and new business opportunities;
- program management services for the overall management and administration of a program;
- underwriting services for evaluating individual risks or classes of risk;
- reinsurance services for placing reinsurance for a program;
- loss control services for evaluating the risks posed by a particular class of risk, as well as the ability of insureds to control their losses;
- claims administration services for the prompt reporting and handling of claims, and the supervision of claims adjusters and TPAs;
- marketing services for designing and placing advertisements and other marketing materials, as well as marketing insurance programs to producers; and
- administrative services, including policy and endorsement issuance, data processing, billing, collecting and reporting premiums, producing financial reports and paying claims

23

## AMERICAN SAFETY INSURANCE HOLDINGS, LTD. AND SUBSIDIARIES

### Notes to Consolidated Financial Statements

#### December 31, 2007 and 2006

(1) Summary of Significant Accounting Policies

    (a)    Basis of Presentation

The accompanying consolidated financial statements of American Safety Insurance Holdings, Ltd. ("American Safety") and its subsidiaries and American Safety Risk Retention Group Inc. ("American Safety RRG"), a non-subsidiary risk retention group affiliate (collectively, the "Company") are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The preparation of financial statements in conformity with GAAP requires management to make estimates, based on the best information available, in recording transactions resulting from business operations. The balance sheet amounts that involve a greater extent of accounting estimates and/or actuarial determinations subject to future changes are the Company's invested assets, deferred income taxes, and the liabilities for unpaid losses and loss adjustment expenses. As additional information becomes available (or actual amounts are determinable), the recorded estimates may be revised and reflected in operating results. While management believes that these estimates are adequate, such estimates may change in the future.

    (b)    Description of Common Stock - Voting and Ownership Rights

The authorized share capital of the Company is 35 million shares, consisting of 30 million common shares, par value $.01 per share ("Common Shares"), and 5 million preferred shares, par value $.01 per share ("Preferred Shares"). The Common Shares are validly issued, fully paid, and non-assessable. There are no provisions of Bermuda law or the Company's Bye-Laws which impose any limitations on the rights of shareholders to hold or vote Common Shares by reason of such shareholders not being residents of Bermuda. Holders of Common Shares are entitled to receive dividends ratably when and as declared by the Board of Directors out of funds legally available therefore.

Each holder of Common Shares is entitled to one vote per share on all matters submitted to a vote of the Company's shareholders, subject to the 9.5% voting limitation described below. All matters, including the election of directors, voted upon at any duly held shareholders meeting shall be authorized by a majority of the votes cast at the meeting by shareholders represented in person or by proxy, except (i) approval of a merger, consolidation or amalgamation; (ii) the sale, lease, or exchange of all or substantially all of the assets of the Company; and (iii) amendment of certain provisions of the Bye-Laws, which each require the approval of at least 66-2/3% of the outstanding voting shares (in addition to any regulatory or court approvals). The Common Shares have non-cumulative voting rights, which means that the holders of a majority of the Common Shares may elect all of the directors of the Company and, in such event, the holders of the remaining shares will not be able to elect any directors.

The Bye-Laws contain certain provisions that limit the voting rights that may be exercised by certain holders of Common Shares. The Bye-Laws provide that each holder of Common Shares is entitled to one vote per share on all matters submitted to a vote of the Company's shareholders, except that if, and so long as, the Controlled Shares (as defined below) of any person constitute 9.5% or more of the issued and outstanding Common Shares, the voting rights with respect to the Controlled Shares owned by such person shall be limited, in the aggregate, to a voting power of 9.5%, other than the voting rights of Frederick C. Treadway or Treadway Associates, L.P., affiliates of a founding shareholder of the Company. "Controlled Shares" mean (i) all shares of the Company directly, indirectly, or constructively owned by any person and (ii) all shares of the Company directly, indirectly, or beneficially   by such person within the meaning of Section 13(d) of the Exchange Act (including any shares owned by a group

-82-

of persons, as so defined and including any shares that would otherwise be excluded by the provisions of Section 13(d)
(6) of the Exchange Act). Under these provisions, if, and so long as, any person directly, indirectly, or constructively
owns Controlled Shares having more than 9.5% of the total number of votes exercisable in respect of all shares of
voting stock of the Company, the voting rights attributable to such shares will be limited, in the aggregate, to 9.5% of
the total number of votes.

No holder of Common Shares of the Company shall, by reason only of such holder, have any preemptive right to
subscribe to any additional issue of shares of any class or series nor to any security convertible into such shares.

(c)     Principles of Consolidation

The consolidated financial statements include the accounts of American Safety Insurance Holdings, Ltd., a Bermuda
company, American Safety Reinsurance, Ltd. ("American Safety Re") and American Safety Assurance Ltd., ("ASA"),
two 100%-owned licensed Bermuda insurance companies, Ordinance Holdings Limited, a 100% owned actuarial,
consulting and licensed Bermuda-based brokerage company, American Safety Holdings Corp. ("American Safety
Holdings"), a 100%-owned insurance holding company, and American Safety Risk Retention Group, Inc. ("American
Safety RRG"), a non-subsidiary risk retention group affiliate. American Safety Holdings in turn wholly owns American
Safety Casualty Insurance Company ("American Safety Casualty"), a property and casualty insurance company,
American Safety Insurance Services, Inc. ("ASI Services"), an underwriting and administrative subsidiary, Ponce
Lighthouse Properties, Inc. ("Ponce"), the development company of the Harbour Village project, and Rivermar
Contracting Company ("Rivermar"), the general contractor of the Harbour Village project. American Safety Casualty
owns 88% of American Safety Indemnity Company, a property and casualty excess and surplus lines insurance
company. The remaining 12% is owed by American Safety Holdings. ASI Services wholly owns the following
subsidiaries: Sureco Bond Services, Inc. ("Sureco"), a bonding agency; Environmental Claims Services, Inc. ("ECSI"),
a claims service firm; American Safety Financial Corp., a financial services subsidiary; and American Safety
Purchasing Group, Inc., which acts as a purchasing group for the placement of certain business with American Safety
Casualty.

In accordance with FASB Interpretation No. 46 (FIN 46), *Consolidation of Variable Interest Entities* (VIEs) and FASB
Interpretation No. 46 Revised (FIN 46R), the accompanying financial statements consolidate American Safety RRG,
based on its status as a VIE and the Company's status as the primary beneficiary of the VIE. A minority interest has
been established for the equity holders of American Safety RRG. The accompanying financial statements also de-
consolidate American Safety Capital Trust, American Safety Capital Trust II and American Safety Capital Trust III
("American Safety Capital", "American Safety Capital II" and "American Safety Capital III", respectively) based on
their status as variable interest special purpose entities of the Company's status as not being the primary beneficiary.
American Safety Capital, American Safety Capital II and American Safety Capital III are accounted for under the equity
method.

All significant intercompany balances have been eliminated, as appropriate, in consolidation.

(d)     Business Environment

The following is a description of certain risks facing the Company and its subsidiaries:

Legal/Regulatory Risk is the risk that changes in the legal or regulatory environment in which an insurer operates will
create additional expenses not anticipated by the insurer in pricing its products and beyond those recorded in the
financial statements. That is, regulatory initiatives designed to reduce insurer profits or otherwise affecting the industry
in which the insurer operates, new legal theories or insurance company insolvencies through guaranty fund assessments,
may create costs for the insurer beyond those recorded in the financial statements. The Company attempts to mitigate
this risk by actively writing insurance business in several states, thereby spreading this risk over a large geographic area.

EXHIBIT "B"



Providing Innovative Insurance Solutions for Specialty Risks

Search

Corporate Structure

Home
About Us
Investor Relations
Press Room
Insurance Products
Producer Resources

Financial Strength
A. BEST
A Excellent

**American Safety Insurance
Holdings, Ltd.**

American Safety
Holdings Corp.

American Safety
Insurance Services, Inc.

American Safety Casualty
Insurance Company

American Safety
Indemnity Company

American Safety Risk
Retention Group, Inc.

American Safety
Reinsurance, Ltd.

American Safety
Assurance, Ltd.

Copyright 2007 American Safety Insurance Services, Inc.



*Providing Innovative Insurance Solutions for Specialty Risks*

| | Search |

Home
About Us
Investor Relations
Press Room
Insurance Products
Producer Resources

**American Safety Insurance Services, Inc.**

For general inquiries, please e-mail us.

Employee Login
Contact Us
Site Map



**Main Office**
Suite 700
100 Galleria Parkway S.E.
Atlanta, GA 30339
t: 800-388-3647
p: 770.916.1908

**California**
**San Diego**
**Construction Defect Claims**
D.B.A. ASIG Insurance Services
11440 West Bernardo Ct.
Suite 166
San Diego, CA 92127
t: 866.642.1149
p: 858.716.2200

**Ohio**
**Cleveland**
**Environmental Regional Office**
10900 Pearl Rd.
Suite B1
Strongsville, OH 44136
p: 440.268.7390

**New Jersey**
**Cherry Hill**
**Environmental Regional Office**
800 N. Kings Hwy.
Suite 401
Cherry Hill, NJ 08034
p: 856.482.8788

**Middletown**
**E&S Lines Regional Office**
One Leonardville Rd.
Middletown, NJ 07748
t: 866.397.0835
p: 732.671.5837

About Us | Investor Relations | Press Room | Insurance Products | Producer Resources
Contact Us | Employee Login | Site Map | Terms and Conditions
Home

*Copyright 2007 American Safety Insurance Services, Inc.*

APR-21-2008  15:06  FROM K.M.F.M.                    TO sprasad@kmfm.com      P.04
American Safety Insurance> Producer Resources > Claims Contacts          Page 1 of 1
Case 3:08-cv-01057-J-WMC     Document 21-4     Filed 04/21/2008     Page 4 of 5



*Providing Innovative Insurance Solutions for Specialty Risks*



Home
About Us
Investor Relations
Press Room
Insurance Products
Producer Resources

Search

Employee Login
Contact Us
Site Map

## Claims Unit Contacts

ASI's claims unit is staffed with highly specialized legal and technical personnel with decades of experience in various disciplines. Our claims team strives to handle claims efficiently, control costs and communicate effectively with all parties involved.

**To report any claim:**
**Phone : 1-800-388-3647**
**Fax : 770-485-1703**

**Construction Defect Claims**
San Diego Office
858.716.2200

**Environmental Claims**
Atlanta Office
p: 770.485.4420

**Specialty Programs Claims**
Atlanta Office
p: 770.485.4303

**Surety Claims**
Atlanta Office
p: 770.485.4391

**All other claims**
p: 770.916.1908

About Us | Investor Relations | Press Room | Insurance Products | Producer Resources
Contact Us | Employee Login | Site Map | Terms and Conditions
Home



Copyright 2007 American Safety Insurance Services, Inc.



*Providing Innovative Insurance Solutions for Specialty Risks*

Search

Employee Login
Contact Us
Site Map

Home
About Us
Investor Relations
Press Room
Insurance Products
Producer Resources



### Our History

**1985**
The environmental liability insurance market experiences a hard cycle, making coverage unaffordable for most contractors.

**1986**
American Safety Insurance Holdings, Ltd. (ASIH) was formed in 1986 as a captive insurance company in Bermuda. We were pioneers, providing insurance solutions to environmental remediation businesses in the United States at a time when insurance coverage for these risks was virtually unavailable.

**1988**
American Safety Risk Retention Group, Inc. is formed under the Liability Risk Retention Act of 1986 to write environmental liability insurance.

**1990**
American Safety Insurance Services, Inc (then called EMIS) was formed as a program administrator for American Safety RRG, and hired the company's first full-time employees.

**1993**
American Safety Casualty Insurance Co., a Delaware-based admitted carrier, is acquired.

**1995**
A.M. Best assigns the American Safety Insurance Group of Companies an "A" (Excellent) rating, which the company has maintained since this date.

**1998**
ASIH completes its initial public offering.

**1999**
ASIH is listed on the NYSE, trading under the ticker symbol "ASI".

**2000**
American Safety Indemnity Co., an Oklahoma-based excess & surplus lines carrier is acquired.

**2003**
ASIH raises more than $50 million through two private trust preferred offerings and a secondary common public stock offering.

**2004**
American Safety Assurance, Ltd. is formed in Bermuda as a segregated cell captive.

**2005**
ASIH raises $25 million in capital through a trust preferred offering.

**2006**
**ASI celebrates 20 years of providing innovative insurance solutions for underserved risks.**

ASIH completes a secondary public offering, raising $53 million in additional capital to support the Company's growth initiatives.



Copyright 2007 American Safety Insurance Services, Inc.